[Civ. No. 4262. Fourth Dist. Oct. 11, 1951.]

JACK HANNA, Respondent, v. ROBERT FRANCIS O'CONNOR et al., Defendants; RUTH A. SHANNON, Appellant.

Desser, Rau, Christensen & Hoffman and William Christensen for Appellant.

Nottbusch & Nottbusch and Frank H. Nottbusch, Jr., for Respondent.

GRIFFIN, J.—Plaintiff and respondent Jack Hanna obtained a nonjury judgment for $5,000 against defendant and appellant Ruth A. Shannon, as a result of an accident arising out of a collision of a motorcycle (on which respondent was riding as a passenger) with the rear end of a car owned by appellant and which was being driven by defendant Robert Francis O'Connor. Appellant Ruth A. Shannon, prior to her marriage to Mr. Nace, owned an old Auburn automobile which remained registered in her maiden name. After her marriage she used it for her own purposes until about July 9, 1949, when she left it parked in front of her house where she resided with her husband. He had been in the business of constructing swimming pools. One of the defendants, Arthur Kalmus, according to his testimony, had been working on a swimming-pool paint. While in a paint store he met defendant O'Connor, whom he had known for several weeks. O'Connor was interested in becoming associated with Kalmus in the business of painting swimming pools. Kalmus told O'Connor he was going over to see Nace about getting some work painting swimming pools. O'Connor asked to go along and they left in a Ford coupé to see about getting a lead on some of the people for whom Mr. Nace had built pools. After some discussion with Mr. Nace, Kalmus asked if the Auburn car was for sale. Mr. Nace informed him it belonged to his wife, who was ill in the house; that she had discussed its possible sale and that his wife wanted $250 for it. Kalmus said if he could drive it home and have it inspected by his mechanic he might buy it to use in his business. Mr. Nace consented and stated he did not believe his wife would object. Kalmus stated he would call Mr. Nace the first thing Monday morning and let him know or he would return the car. Kalmus asked for the key. Nace produced his key ring and, according to his story, Kalmus noticed a car key which appeared as though it would fit the specific car lock described by Kalmus. The gas tank was locked and no key was given to it. The car battery was low. It was necessary to start the car by shoving it. O'Connor drove the Ford and Kalmus drove the Auburn to his home. The mechanic came Sunday and examined the car. O'Connor was there talking with Kalmus about the paint.

Kalmus informed him the mechanic recommended against its purchase. O'Connor suggested to Kalmus that he might purchase it and would take the car back to the Nace home and try to make financial arrangements with them for its purchase. Kalmus delivered the key to O'Connor with that understanding. This testimony is corroborated by the testimony of Mr. Nace.

O'Connor did not return the car as indicated. On the following Wednesday Nace, according to his story, tried to phone Kalmus as to why the car was not returned but was unsuccessful in reaching him. On the following Friday he did reach him and asked him about the car and its whereabouts. Kalmus told him O'Connor was supposed to have brought it back on Monday, and registered surprise that he had not returned it. Kalmus obtained the license number of the car and agreed to call the police and report it stolen. Kalmus testified he called the police but found such a report could not be made over the phone. Apparently no written report was made. On Sunday, July 17, O'Connor phoned Mr. Nace from Oceanside stating that he was in jail because of lack of proper registration of the car and asked Nace to send him $15 to cover "impounding charges." This request was refused. O'Connor was incoherent in his conversation. Nace called the Oceanside police and told them not to turn the car over to O'Connor. He and his wife drove to Oceanside, found the battered car, and discovered the gas tank lock had been broken so additional gas could be supplied to the car. They heard the story about the accident from the police. O'Connor had been charged with being drunk but was subsequently released and has never been heard from since. One of the highway patrol officers told the Naces that O'Connor tried to sell the car to him and his brother but could produce no papers showing legal possession.

Opposed to this evidence is the testimony of the highway patrol officer at Oceanside which was given from notes he claimed to have made at the time. He testified quite positively that when Mr. and Mrs. Nace came to Oceanside he asked Mrs. Nace to tell him "what the circumstances were on the automobile, how it happened to be in the possession of Mr. O'Connor. She stated that Mr. O'Connor and a partner of his (the name was not mentioned) were interested in purchasing the vehicle for some business venture and that Mr. O'Connor had the vehicle on a trial basis, and that he had had the car for quite some time and that they were wondering

where he was and then this thing had come up. They had gotten the word of the accident and come down and Mr. Nace stated that feeling the automobile was sold, or was being sold, he had called his insurance agent, the name not given, but the agent being the Automobile Club of Southern California, asking that the insurance be canceled on the car.'' The Naces denied this conversation, admitted they did not tell him the car had been stolen but stated that they told him that it was taken by O'Connor without their permission. Mr. Nace testified that he did tell the officer that he had called the auto club, where he carried insurance on his own car, and asked them if he would be covered if he drove his wife's car back to Los Angeles.

In appellant's deposition, taken before the trial, she testified that the car was owned by her; that after her marriage she used it on occasions to go to the store and for her general transportation; that her husband paid for the state license; that it disappeared from in front of her home on the afternoon of July 9th; that she thought it had been stolen; that she did not report it as stolen; that she was the only one who had a key to it; that she was quite unhappy when she found that the car was gone; that when Mr. Nace explained what happened she did not like the idea very well but that she did not want to go to Mr. Kalmus and tell him to bring the car back; that she did have his address and that she was willing to have him look at it; that after the accident she did not ask Mr. Nace how O'Connor got the key to the car.

██ It is appellant's first contention that the evidence is insufficient to show negligence on the part of O'Connor in the operation of the car. The highway patrol officers, who were proceeding southerly on Highway 101 just south of Los Flores that afternoon, noticed the Auburn car parked off of the highway with the hood up and headed in a northerly direction. O'Connor was standing by it. That evening, about 10 p. m., plaintiff Hanna and his wife were driving south on Highway 101 just north of that vicinity and their car ran out of gas. They pulled off of the highway. A gentleman on a motorcycle stopped and offered to take Hanna back to a service station. Hanna rode on the extra seat of the motorcycle. The lights were on. It started north in the east lane of the four-lane highway. It overtook and passed one car and swung back into the east lane, and all of a sudden the motorcycle ran into the rear of the Auburn car which was in that lane. Plaintiff and the motorcycle driver were thrown off and

severely injured. They remembered nothing further about the accident.

The point of the accident was about one mile north of the place where the officers first saw the Auburn car 2½ hours before. Hanna testified that as he was proceeding south in his car he noticed no lights on any car if one was parked in the east lane of the northbound traffic. The two traffic officers were proceeding southerly on the highway that evening and just as a bus started to pull by them they heard a crash and observed a cloud of dust which reflected in the headlights of an oncoming car. They turned around and found the Auburn car standing in the east northbound lane, headed north, without lights upon it. O'Connor was standing near its left rear wheel. The point of impact was about 48 feet south of the Auburn car and was about 4½ feet west of the east edge of the paved portion of the highway and in the main traveled portion. The officers testified that they checked the dash, headlight and ignition switch, and they were in an "on" position but no lights were burning. The car was out of gear, the emergency brake was off, and the motor was not running. The motorcycle was found near the center of the easterly northbound lane and apparently struck the Auburn car to the left of its rear center line. No doors were open. The car was hauled to the garage in Oceanside. A test was made of the filament in the taillight by attaching it to a battery. It operated. It is reasonable to infer from the facts in this case that the Auburn automobile was stopped on the main traveled portion of the highway without lights. The position of the point of impact shows clearly that the Auburn was on the main traveled portion of the highway. The photographs in evidence show considerable damage to the Auburn car and indicate that a great force from the rear caused it. The fact that the lights would not burn when the ignition was turned on and the fact that O'Connor was uninjured might well indicate he was not seated in and driving the car at the time of the impact. There was sufficient evidence to support the court's finding that the actions of O'Connor constituted negligence. (Veh. Code, § 582; Veh. Code, § 514; *Jackson* v. *Butler,* 88 Cal.App.2d 608, 610 [199 P.2d 63]; *Thomson* v. *Bayless,* 24 Cal.2d 543, 546 [150 P.2d 413].) The evidence further justifies the finding that plaintiff was not guilty of contributory negligence. (*Smith* v. *Occidental etc. Steamship Co.,* 99 Cal. 462 [34 P. 84].)

The difficult question is whether the evidence is sufficient

to support the finding that O'Connor was using and operating the vehicle at the time of the accident with the express or implied permission of appellant owner. The testimony is that neither Kalmus nor O'Connor ever saw or conversed with appellant at the time they took or drove the car away. Accordingly, no *express* consent was given by her. She claimed that she was not aware that Mr. Nace had turned the car over to Kalmus until several days later. There is evidence that Mr. and Mrs. Nace, prior to the time the car was turned over to Kalmus, did discuss between them the advisability of selling the car, and apparently Mrs. Nace had fixed a price. Although Mr. Nace claimed he did not drive the car except on one or two occasions, the possession of a key to it might indicate some implied authority from appellant for Mr. Nace to drive it or to turn it over to a prospective buyer for demonstration purposes. As between appellant and Kalmus, therefore, it might be reasonable to hold that there was an implied authority for him to drive the car home for the purpose of having his mechanic examine it, and to have Kalmus return it to appellant on the following Monday, if he failed to consummate the sale. But does this apply to O'Connor during the period he had it and under the circumstances here related?

It is respondent's argument that the evidence on this subject is conflicting; that there is testimony by an officer, in the form of a declaration by the appellant, showing that the registered owner impliedly gave possession of the car to "O'Connor and a partner of his" without restriction as to the time when or the place where the car was to be used.

There was some evidence that these parties discussed a contemplated future business arrangement between them. Mr. Kalmus testified, however, that this car was not to be used in any contemplated partnership deal. The trial court absolved defendant Kalmus from any liability and specifically found that it was "not true" that O'Connor was an agent or servant of appellant Ruth A. Shannon.

The question of implied consent under section 402 of the Vehicle Code was thoroughly discussed in the main opinion, in the concurring opinion, and in the dissenting opinion in *Souza* v. *Corti*, 22 Cal.2d 454 [139 P.2d 645, 147 A.L.R. 861]. The several opinions cite the rule laid down in *Henrietta* v. *Evans*, 10 Cal.2d 526 [75 P.2d 1051]; and *Engstrom* v. *Auburn Auto. Sales Corp.*, 11 Cal.2d 64 [77 P.2d 1059]. In distinguishing the Engstrom and Henrietta cases the court

said that in the Souza case there was no question concerning the use of the car *for the period for which it was borrowed,* and the use which was being made of the borrowed car at the time of the accident was *the use which was contemplated by the owner.* (See, also, *Howland* v. *Doyle,* 6 Cal.App.2d 311, 315 [44 P.2d 453].)

In the absence of the testimony of the highway patrol officer concerning the claimed admissions of appellant, it might be difficult to sustain the finding, under the rules laid down in the cited cases. From his testimony it might appear that ''O'Connor and a partner of his'' were interested in purchasing the vehicle for some business venture and that O'Connor ''had the vehicle on a trial basis'' and had had it ''for quite some time'' and that the Naces were wondering where he was.

Apparently the trial court believed the testimony of the officer as opposed to the testimony of the appellant and the remaining witnesses. ■ It is not the function of this court to weigh the evidence nor to determine the credibility of the witnesses. (Code Civ. Proc., § 1847.) This court, on appeal, must accept as true all evidence tending to establish the correctness of the finding or verdict, and must consider the evidence in the most favorable aspect toward the prevailing party and give that party the benefit of every inference that can reasonably be drawn in support of his claim. (*Cope* v. *Goble,* 39 Cal.App.2d 448 [103 P.2d 598].) ■ Provided the trier of facts does not act arbitrarily, he is authorized to reject the testimony of a witness in its entirety when convinced it is unworthy of belief, even though the testimony of the witness is uncontradicted. (*Blank* v. *Coffin,* 20 Cal.2d 457 [126 P.2d 868]; and *Hicks* v. *Reis,* 21 Cal.2d 654, 659 [134 P.2d 788], and cases cited.)

■ We conclude that although the evidence is highly conflicting and might well have been decided otherwise, it cannot be said, as a matter of law, that the evidence, aided by inference and presumption that arise under the holding in *Prickett* v. *Whapples,* 10 Cal.App.2d 701 [52 P.2d 972]; and *Lanfried* v. *Bosworth,* 45 Cal.App.2d 408 [114 P.2d 406], is insufficient to support the finding that the owner, Mrs. Nace, gave her consent, either express or implied, to O'Connor, to drive the car on the day and on the occasion of the accident, or insufficient to hold that the use O'Connor was making of the car at the time was not one that could be, under the circumstances, reasonably contemplated by the owner.

768

Finally, it is claimed the court erred in denying a motion for mistrial, and in overruling an objection to a question propounded to appellant on cross-examination as to whether, from 1947 to 1949, she carried any insurance, such as collision insurance, on her automobile. She answered in the negative. Apparently the trial court justified its ruling on the ground that it was admissible as bearing on the question whether she or her husband had some joint or community interest in the car *and its operation* and as bearing on the question whether either had called the insurance company and told them the car had been sold. As commented by the court, this was not a jury case. It stated it was not interested in the question of insurance but was interested in knowing whether the parties acted jointly in regard to the maintenance and sale of the car and for the purpose of determining the truth of the statement of the officer that the insurance company was called and told to cancel the policy because the car had been sold. When considered for this sole purpose, as indicated, the ruling of the court cannot be said to be prejudicially erroneous or that an order granting a mistrial must follow.

Judgment affirmed.

Barnard, P. J., concurred.