Filed 10/5/16  Sokol v. Rosciszewski CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| KAZIMIERZ SOKOL, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ANNA K. ROSCISZEWSKI, <br><br> Defendant and Respondent. | D067282 <br><br><br> (Super. Ct. No. 37-2013-00043497-CU-PO-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Timothy Taylor, Judge.  Affirmed.

Law Office of Stephen L. Gordon and Stephen L. Gordon for Plaintiff and Appellant.

Law Office of Priscilla Slocom, Priscilla Slocum; Boles & Di Mascio and Roger L. Popeney for Defendant and Respondent.

Kazimierz Sokol brought suit for personal injuries arising from a fall down crumbling stairs outside his apartment.  Anna K. Rosciszewski (his landlord), stipulated

to her negligence. A trial was held and the jury determined Rosciszewski's negligence was a substantial cause of Sokol's injuries. The jury awarded Sokol damages of $36,474.89 for past medical expenses and $5,000 for past pain and suffering. The jury did not award Sokol any damages for future losses.

On appeal from a judgment entered on the jury's special verdict, Sokol contends the damages award is inadequate as a matter of law. Sokol further contends that he was prejudiced by the cumulative effect of the trial court's various actions.

Neither of Sokol's contentions has merit. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On April 21, 2011, Sokol was walking down the stairs outside his second floor apartment when one of the steps crumbled. Sokol fell down several stairs to the cement floor at the bottom of the stairs, injuring his left foot, twisting his back and striking his left knee, left elbow and right shoulder on the railings. Sokol took pictures of the stairs on the day of his fall as proof that he did not stage the accident.

Shortly after the accident, Sokol went to the emergency room but left after waiting for hours without being treated. The next day, he went to an urgent care facility. The urgent care records did not note any swelling, bruising or discoloration of Sokol's left knee. Two days later, Sokol saw his family doctor, who advised him to see an orthopedist. Sokol left for Poland on May 25, 2011, and stayed there for three months. While in Poland, Sokol saw an orthopedist, participated in physical therapy, and obtained MRI's of his left foot, left knee and lower back.

2

Sokol filed his complaint on April 10, 2013.  Trial began on October 6, 2014, and concluded on October 14, 2014.

*Sokol's Background and Prior Activities*

Sokol came to the United States in 1986 as a political refugee.  He was a member of the Solidarity movement in Poland, was arrested twice, spent time in jail, and left Poland in 1985 to avoid a third arrest.  Sokol was very active since childhood, playing soccer, volleyball, basketball and ping pong, skiing and bicycling.  From 2002 to 2011, Sokol played soccer and tennis, jet skied, snow skied, ran on the beach, biked "a lot" and lifted weights at his home gym.  He also went fishing, which he can no longer do because he cannot walk on uneven surfaces.  Sokol provided photographs of himself fishing, jet skiing, snow skiing and playing volleyball, but only the jet skiing photograph (from 2001 or 2002) was less than 20 years old.  Sokol had more recent photographs on his computer, but the computer crashed, he was unable to retrieve the photographs and the computer is now in Poland with his brother.

Three of Sokol's friends testified at trial.  One said Sokol used to dance and go on trips, but following the accident Sokol acts like an old man and is less patient, more nervous and "[m]ore miserable."  Another said that prior to his injury Sokol used to perform volunteer work, go on canoe trips, dance and play volleyball.  Sokol tried to play volleyball following his injury, but was no longer a reliable player and had become less social.  The third friend testified that Sokol used to jet ski, snow ski, play soccer, camp and fish, but no longer participates in those activities due to his knee injury.  In addition,

3

the jury saw portions of videotaped depositions of Sokol's brother and another friend, but transcripts of their testimony were not provided on appeal.

*Sokol's Work History*

In Poland, Sokol trained to become a master mechanic and worked as a mechanic for about eight years. Sokol then worked as a mechanic in San Diego intermittently from 1986 to 1999. By 1999, Sokol was making $17.50 per hour as a mechanic. Sokol quit his mechanic's job to work for himself repairing and reselling cars he bought at auction. He performed most of the work personally and would typically work on five cars per year, making around $15,000 annually. Sokol threw away any documentation related to the refurbished vehicles after a few months. The jury saw pictures of cars Sokol had repaired, but all were taken more than five years before his injury.

Beginning in 2001, Sokol worked maintaining properties he owned in Poland and made $400 to $500 per month on the properties. The properties were sold prior to the accident. Sokol also performed glass work on large sculptures, but the glass artist Sokol worked with died in 2004 and Sokol's part-time glass work ended. Prior to his accident, Sokol had intended to go back to full-time work as a mechanic sometime in 2011, and had planned to continue to refurbish auctioned vehicles.

*Sokol's Physical Injuries*

Sokol was first evaluated by his medical expert, Jon Kelly, M.D., on November 23, 2011. Dr. Kelly examined the MRI's of Sokol's back, knee and ankle taken in Poland. The MRI of Sokol's left knee showed a ligament sprain, but Dr. Kelly could not correlate the injury to Sokol's ongoing pain because the ligament had healed. Dr. Kelly

4

determined Sokol had symptoms arising from the knee joint, including tendonitis. The MRI of Sokol's back showed traction spurs and evidence of degenerative disk disease. Dr. Kelly did not believe the fall caused Sokol's back conditions, but opined that the fall aggravated them. Regarding Sokol's ankle, Dr. Kelly diagnosed Sokol with a sprain and mild preexisting arthritis that became symptomatic as a result of the injury.

Dr. Kelly treated Sokol's back with physical therapy and nonsteroidal anti-inflammatory agents. Dr. Kelly considered giving Sokol localized injections in his back for pain, but did not do so. Dr. Kelly treated Sokol's knee with oral medications (steroidal and nonsteroidal), three viscosupplementation injections and physical therapy. Despite the treatments, Sokol continued to complain of pain and swelling in his knee after activities. Dr. Kelly never observed any activity-related swelling.

Dr. Kelly performed arthroscopic surgery on Sokol's left knee. Dr. Kelly found: (1) thickening of the joint lining, which could be caused by trauma or other things; (2) loss of cartilage behind the knee cap, which could be caused by trauma but "looked like it had been there for a while" and "is not uncommon as individuals age"; and (3) a condyle cartilage injury Dr. Kelly believed was caused by the fall because it was in an atypical area and looked different than a typical chronic degenerative injury. During the surgery, Dr. Kelly tried to debride the condral[1] defect in Sokol's knee.

Dr. Kelly believed Sokol's pain was caused by the combination of the knee cap cartilage loss and the condyle defect. Dr. Kelly opined that Sokol's knee would not get

---

[1] The cartilage injury to Sokol's condyle is alternatively referred to as a "condyle defect" and "condral defect" in various places in the trial transcript.

better because the surgery did not resolve the pain and Sokol's condition had not improved in over three and a half years, despite treatment. Dr. Kelly recommended Sokol avoid kneeling on his left knee, impact activities (such as jogging), walking on uneven ground, squatting and prolonged walking. Dr. Kelly testified that being a mechanic was not a reasonable occupation for Sokol "primarily because it requires kneeling." Dr. Kelly also opined that the degenerative condition in Sokol's lower back would require restrictions on running, bending and certain types of lifting. Sokol could perform sedentary work if he could get up and move around when his back acts up and had a seat that would allow him to extend his knee beyond a 90-degree angle.

On cross-examination, Dr. Kelly admitted that Sokol displayed full range of motion in his knee and back, and that he had never observed swelling or fluid in Sokol's knee during any time he saw him, "other than in the post-op period or subsequent to the injections that I provided." In reviewing photographs taken during Sokol's knee arthroscopy, Dr. Kelly noted in his report that Sokol's symptoms "are much greater than what the photographs would suggest" and also noted that the "pain and pathology do not have a direct correlation." In addition, regarding Sokol's back injury, Dr. Kelly admitted he had not recorded any complaints of back pain after Sokol's first visit on November 23, 2011. Dr. Kelly could not recommend any further treatment that would benefit Sokol.

Sokol testified that his left knee hurts if he stands for more than 10 or 15 minutes or walks more than 60 or 80 yards (approximately two to three minutes). He cannot squat, crouch or put his full weight on his left knee when kneeling, and needs to use

6

support to pull himself up from a kneeling position. Sokol has a knee brace that helps "[a] lot" and he wears it "almost on a daily basis."

In the opinion of Raymond Vance, M.D., Rosciszewski's medical expert, Sokol had incurred a blunt force or spraining injury to his knee and low back due to his fall. Regarding the knee, there was no evidence of any ligament tear and no remaining ligament injury. Dr. Vance characterized the condyle cartilage defect as a commonplace abnormality associated with aging that could not be attributed to the accident. Dr. Vance determined Sokol had no objective abnormality that would normally constitute a disability from occupational activity, and most people with the same or similar type of conditions would be able to pursue even a physically demanding occupation. Dr. Vance could not predict that Sokol would need any future treatment other than Sokol's "own pursuit of a good exercise program, good nutrition, and body conditioning."

On cross-examination, Dr. Vance conceded that although he believed all of Sokol's knee conditions were preexisting, he could not say for certain whether Sokol would have had a problem with his left knee absent the fall. Dr. Vance admitted that Sokol still claimed to have pain, and more likely than not still had problems with his knee due to the fall which may continue for the rest of his life. Dr. Vance also agreed that the restrictions Dr. Kelly placed on Sokol's activities were reasonable from the perspective of a treating physician. However, Dr. Vance reiterated that the structural abnormalities in Sokol's knee are minor and none of them should disable him from employment.

On redirect, Dr. Vance emphasized the distinction between objective and subjective findings, explaining that Sokol's complaint of knee pain or swelling is

7

subjective, but a physician could objectify complaints of swelling if the physician ever observed it. Dr. Vance again noted the lack of any objective evidence to support Sokol's subjective complaints, explaining Sokol did not have significant atrophy, gait impediment or a structural abnormality that would normally disqualify him from occupational activity.

At the end of trial, the jury watched a video of Sokol taken without his knowledge. The video showed Sokol walking without a knee brace on two different days, without any discernable limp or stiffness, standing and pacing while on his cell phone for several minutes, opening the door to a car and squatting down twice to access something on the passenger side floor, and easily raising back into a standing position both times without holding onto anything.

*Sokol's Psychological Injuries*

The step Sokol fell from was not repaired for six months after his fall and Sokol feared falling every time he used the stairs. Since his fall, Sokol has had bad dreams about falling down large staircases and out of an airplane and has difficulty sleeping. In addition, Sokol is now uncomfortable in elevators and on escalators due to his fear of falling.

In November 2012, more than a year after the fall, Sokol went to see Jeffrey Schanowitz, Ph.D., a psychologist recommended by his attorney. Sokol saw Dr. Schanowitz over the course of two years, approximately 30 times. Dr. Schanowitz used the criteria in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM-5) to evaluate Sokol for PTSD. Dr. Schanowitz

8

provided Sokol with the civilian PTSD checklist. Sokol described experiencing all 17 symptoms on the checklist, and for all but two of the 17 criteria, his symptoms "were rated at a four or a five, being extremely or quite a bit." Dr. Schanowitz diagnosed Sokol with PTSD and predicted Sokol would need ongoing treatment for an extended period of time, up to several years, at $200 per session.

On cross-examination, Dr. Schanowitz indicated he had previously diagnosed another of Sokol's attorney's clients with PSTD after she was the victim of a home invasion. Dr. Schanowitz was currently treating five or six patients with PSTD, about 10 percent of his patients. When asked if a person's spraining their finger because it gets closed in a door supports a diagnosis of PSTD, Dr. Schanowitz said "[i]t may."

Rosciszewski's expert, Matthew Carroll, M.D., (formerly a medical officer and psychiatrist in the Navy), opined that Sokol was not suffering from PTSD because the trauma causing PTSD must be severe. Dr. Carroll based his opinion on his years of experience, the thousands of patients he had seen with PTSD, his reading about the disorder and the examples of traumatic events causing PTSD listed in the DSM-5. Dr. Carroll opined that Sokol suffered from a different disorder that typically required treatment ranging from a few sessions to up to six months.

On cross-examination, Dr. Carroll agreed that the type of therapy Dr. Schanowitz provided was appropriate care and the $200 hourly charge was reasonable. Dr. Carroll also agreed that he could not state a specific date when Sokol's disorder would go away if Sokol continued to be stressed by ongoing pain.

9

*Sokol's Medical and Counseling Bills*

Dr. Schanowitz billed Sokol $7,800 for two years of treatment, but $400 was for deposition review, which he agreed to take out of the bill, leaving it at $7,400. Dr. Kelly's total bill was $32,052.50, which he characterized as reasonable. Dr. Kelly also testified that all of Sokol's other medical bills were reasonable, other than the bills from Poland, which he did not evaluate. Dr. Kelly charged $700 for each office visit, a portion of which was for his preparation of the corresponding "med/legal report."

Rosciszewski's medical billing expert, Nancy Michalski, R.N., audited Sokol's medical bills. Michalski opined that some of the bills were reasonable as stated, but others were not. Michalski reviewed gross billings in the amount of $59,189 and identified necessary reductions totaling $41,478.96, calculating the total reasonable value of the billed services as $17,710.04. Michalski only reviewed $21,895 of Dr. Kelly's total billings of $32,052.50.

*Sokol's Earning Capacity and Economic Losses*

Sokol's vocation rehabilitation counselor, Tracy Remas, opined that Sokol would earn $34,237 to $45,510 annually as a mechanic if he returned to work, but his knee injury precluded him from doing so. Based on Sokol's abilities, language capacity and age (Sokol was 58 years old at the time of trial), Remas found Sokol unlikely to be employable in any other capacity. Remas did not believe training would allow Sokol to obtain skilled jobs and believed any unskilled jobs would require too much physical activity. He also testified Sokol could no longer profitably refurbish cars purchased from auctions because the bulk of his profit came from his own labor and he could no longer

complete the repairs. Remas further testified that Sokol's various limitations precluded him from performing other jobs in the automotive industry, such as an auto sales representative or automotive insurance appraiser of auto damage.

In contrast, Rosciszewski's vocational rehabilitation consultant, Behnush Mortimer, Ph.D., testified Sokol's prior work experience had provided him with transferrable skills that render him employable. Dr. Mortimer opined that Sokol could potentially continue to refurbish cars from auctions by making some adjustments, or work in other automotive related occupations such as auto sales, cashier, counter clerk for an auto parts store, courier, truck driver or automotive insurance appraiser. She also described available programs for vocational counseling, including one that offers funds for training and helps clients develop a vocational plan. On cross-examination, Dr. Mortimer acknowledged that participation in vocational counseling would not guarantee Sokol a job and that older workers have more difficulty getting jobs.

There was no evidence that Sokol had taken any steps to get a job or training following the accident.

*Sokol's Damages for Lost Work*

Sokol's damages expert, Paul Zimmer, CPA, opined on Sokol's economic losses. Relying on Remas's opinion that Sokol would have returned to work as a full-time mechanic in January of 2013, and using an annual salary of $39,875 (the "midpoint" of the range of mechanics' salaries provided by Remas), Zimmer estimated Sokol's damages from lost work up to the time of the trial as $67,523. Based on Remas's opinion that

11

Sokol would continue working until he was 62.5, Zimmer calculated Sokol's lost future earnings as $192,364.

*Jury Verdict and Posttrial Proceedings*

At the conclusion of trial, the jury rendered a special verdict. It found that Rosciszewski's negligence was a substantial factor in causing harm to Sokol. It further found Sokol had suffered past economic losses for "medical expenses" in the amount of $36,474.89 and past noneconomic losses, described as "including physical pain/mental suffering," in the amount of $5,000. The jury awarded no damages for past lost earnings, lost profits or any other past economic losses and awarded no damages for future losses of any kind. Because the amount of damages the jury awarded was less than the statutory offer to compromise under Code of Civil Procedure section 998, the trial court entered judgment in Sokol's favor in the amount of $41,474.89, less Rosciszewski's costs.

Shortly thereafter, Sokol filed a notice of intent to move for a new trial, or in the alternative a motion for judgment notwithstanding the verdict, and a notice of intent to move for additur. Sokol sought a new trial on the grounds of: (1) inadequate damages; and (2) insufficiency of the evidence to justify the verdict. Rosciszewski opposed the motions. Following oral argument, the trial court denied Sokol's motions, finding that substantial evidence supported the jury's verdict.

Sokol timely appealed.

## DISCUSSION

### *Standard of Review*

The amount of damages to be awarded is a question of fact for the jury to decide in the first instance. (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506; *Miller v. San Diego Gas & Electric Co.* (1963) 212 Cal.App.2d 555, 558 (*Miller*).) On a new trial motion challenging the adequacy of the damages awarded, the trial court sits as a 13th juror with the power to weigh the evidence and judge the credibility of the witnesses. (*Seffert*, at p. 507; see Code Civ. Proc., § 657 ["A new trial shall not be granted upon the ground of . . . excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."].)

" 'Whether the contention is that the damages fixed by the jury are too high or too low, the determination of that question rests largely in the discretion of the trial judge. The appellate court has not seen or heard the witnesses, and has no power to pass upon their credibility. Normally, the appellate court has no power to interfere except when the facts before it suggest passion, prejudice or corruption upon the part of the jury, or where the uncontradicted evidence demonstrates that the award is insufficient as a matter of law. In determining whether there has been an abuse of discretion, the facts on the issue of damage most favorable to the respondent must be considered.' " (*Miller*, *supra*, 212 Cal.App.2d at pp. 558-559; see *Gersick v. Shilling* (1950) 97 Cal.App.2d 641, 645 (*Gersick*).)

13

"An appealed judgment is presumed correct, and the appellant must affirmatively demonstrate error.  [Citation.]  An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law.  [Citations.]  An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient.  The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment.  An appellant, such as [plaintiff], who cites and discusses only evidence in her favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment."  (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 (*Rayii*).)

## Damages for Past Medical Expenses

On appeal, Sokol urges us to reverse the award of medical expenses and order a new trial.  Sokol sought payment for $78,871 in medical bills, but was awarded only $36,474.89.  Sokol argues that the award of "less than one-half of the amount of medical expenses incurred" is "inadequate as a matter of law."  We disagree.

"To be recoverable, a medical expense must be both incurred *and* reasonable." (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 555.)  "The rule that medical expenses, to be recoverable, must be both incurred *and* reasonable [citations] applies equally to those with and without medical insurance."  (*Id.* at p. 559, fn. 6.) "[I]initial medical bills are generally insufficient on their own as a basis for determining the reasonable value of medical services . . . cases have held that a plaintiff who relies

14

solely on evidence of unpaid medical charges will not meet his burden of proving the reasonable value of medical damages with substantial evidence." (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1335 (*Bermudez*).)

In his opening brief, Sokol completely ignored (and did not include in the record on appeal) the testimony of Rosciszewski's billing expert.[2] Michalski opined that of the $59,189 in billings that she reviewed, the total reasonable value was only $17,710.04. In addition, Sokol did not provide evidence of the reasonableness of Sokol's medical bills from Poland and therefore failed to meet his burden for obtaining recovery of those charges under *Bermudez*. Furthermore, it is undisputed that a portion of Dr. Kelly's office fee was charged for preparing a "med/legal report," which the jury could reasonably conclude exceeded charges necessary for medical service. Under these facts, we conclude that there was substantial evidence as to the amount of Sokol's reasonable medical expenses and he has failed to establish that the court or jury should have awarded a different figure.

*Future Economic Damages*

Sokol further contends a new trial is required because the jury did not award any damages for Sokol's future economic loss even though both experts agreed Sokol would not be able to resume his duties as an auto mechanic because of his physical limitations. Sokol characterizes his situation as a "trauma forced retirement" and asks how such

---

[2]     The testimony of Michalski and an additional defense witness, video footage of Sokol and various minute orders were added to the record pursuant to Rosciszewski's motion to augment record on appeal, which we granted on March 18, 2016.

15

circumstance could not cause future economic loss. Sokol ignores substantial evidence on the record militating against any award of future economic damages.

First, as previously noted, there was no objective evidence that Sokol's injuries would interfere with his future job prospects. The limitations Dr. Kelly placed on Sokol were based on Sokol's subjective reports of ongoing pain and swelling, which the jury may have declined to believe.

Second, Sokol's last regular employment as a mechanic was in 1999, 12 years prior to the accident. Although Sokol testified that he used his mechanical skills to refurbish vehicles for profit after that time, he did not provide any records to support his claim. Evidence also showed that Sokol's other sources of income, through property management and glass work, no longer existed at the time of his fall. Consequently, the jury may have concluded that Sokol had not established any ongoing source of revenue that would likely continue into the future absent his injury.

Third, parties presented conflicting evidence of Sokol's future employment prospects. Sokol's experts testified that he was unemployable as a result of the fall, but otherwise could have returned to work as a full-time mechanic in 2013, making a mid-range mechanic's salary, and continued working full-time until age 62.5. Rosciszewski's expert testified that even if Sokol were precluded from working as a full-time mechanic due to his injuries, he had transferrable employment skills, which could be augmented through additional training and education. There was no evidence that Sokol had applied for any jobs or sought any training or education during the three-year period following his accident. In light of the evidence, the jury may have found it was unlikely Sokol

16

would have worked full-time as a mechanic until he was 62.5 even absent the fall, and his proffered damages for future lost wages were speculative. We conclude that there was substantial evidence to support the decision not to award future economic damages and Sokol has not established that "the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657.)

*Noneconomic Damages*

Sokol also contends the jury award of $5,000 for past pain and suffering and nothing for future noneconomic damages is inadequate as a matter of law. Sokol relies on *Dodson v. J. Pacific, Inc.* (2007) 154 Cal.App.4th 931 (*Dodson*), *Gallentine v. Richardson* (1967) 248 Cal.App.2d 152, 155 (*Gallentine*), and *Haskins v. Holmes* (1967) 252 Cal.App.2d 580 (*Haskins*). Each of these cases is distinguishable from Sokol's case.

In *Dodson,* plaintiff underwent surgery, under general anesthesia, in which a herniated disc was removed and replaced with a metallic plate. (*Dodson, supra,* 154 Cal.App.4th at pp. 937-938.) The jury awarded Dodson at least partial damages for his surgical expenses, but awarded nothing for pain and suffering. (*Id.* at p. 938.) Upon review, the court held "[w]here a plaintiff undergoes a serious surgical procedure which a jury's special verdict attributes to an accident caused in part by the negligence of the defendant, the plaintiff must necessarily have endured at least some pain and suffering, and a damage award concluding otherwise is therefore inadequate as a matter of law." (*Ibid.*) In *Gallentine,* the jury similarly awarded no damages for pain and suffering even though it awarded damages for medical expenses associated with plaintiff's bullet wound, which required surgery and a three-day hospital stay. (*Gallentine, supra,* 248 Cal.App.2d

17

at pp. 153-154.)  In *Haskins*, plaintiff was the victim of an assault and battery resulting in " 'extensive facial injuries,' " including fractures to the cheek and jaw bones which required surgery and a four-night hospital stay but obtained only a "nominal award of $88.63" beyond her medical expenses, which the court found "in effect allows nothing for the pain, suffering and inconvenience which inevitably accompany the type of injuries and surgery involved."  (*Haskins, supra,* 252 Cal.App.2d at pp. 583, fn. 1, 587.)

Sokol's medical treatment consisted of knee arthroscopy, oral medication, three injections and physical therapy.  Depending upon whose testimony the jury credited, Sokol's injuries attributable to the fall range from a knee, ankle and back sprain, healed at the time of trial, and aggravation of preexisting back, knee and ankle conditions up to a cartilage defect of the left knee.  Sokol's case is therefore distinguishable from the cases he cites (*Dodson, supra,* 154 Cal.App.4th 931; *Gallentine, supra,* 248 Cal.App.2d 152; and *Haskins, supra,* 252 Cal.App.2d 580) in which there was a profound inconsistency between proven severe injuries and nonexistent (*Dodson* and *Gallentine*) or nominal (*Haskins*) damages for pain and suffering.  In contrast to the awards in those cases, Sokol's $5,000 award for past pain and suffering is not so disproportionate to the severity of his established injury that we can find it inadequate as a matter of law.

The jury did not award any future damages to Sokol.  Accordingly, unlike the cases referred to above, there is no inconsistency here between the noneconomic and economic damages awarded.  "The amount of noneconomic damages to award for pain and suffering is a subjective determination that is particularly within the discretion of the jury."  (*Rayii*, *supra,* 218 Cal.App.4th at p. 1416.)  As described in *Gersick,* "to the extent

18

of the injuries claimed, the jury was not bound by the doctors' testimony or by that of plaintiff.  The jury not only saw the plaintiff and observed her actions, but saw the [medical evidence]."  (*Gersick, supra,* 97 Cal.App.2d at p. 649.)  "Provided the trier of facts does not act arbitrarily, he is authorized to reject the testimony of a witness in its entirety when convinced it is unworthy of belief, even though the testimony of the witness is uncontradicted."  (*Hanna v. O'Connor* (1951) 106 Cal.App.2d 760, 767.)  In contrast, we have "not seen or heard the witnesses, and [have] no power to pass upon their credibility."  (*Miller, supra,* 212 Cal.App.2d at p. 558.)

Sokol asserts that parties stipulated to negligence and causation[3] and both parties' experts stated that Sokol suffered severe permanent orthopedic and psychological injuries.  Sokol again fails to discuss the unfavorable evidence and therefore waives his contention that the evidence is insufficient to support the judgment.  (*Rayii, supra,* 218 Cal.App.4th at p. 1408.)  In any case, there was substantial evidence to support the jury's unanimous decision not to award future noneconomic damages.[4]  We can infer the jury determined, to the extent Sokol experienced physical or psychological injuries due to the fall, they were largely resolved at the time of trial and would not present a significant impediment to his future lifestyle.

---

[3]     In fact, Rosciszewski admitted negligence, but causation was determined by the jury through special verdict.

[4]     The court's polling of the jury postverdict indicated that the verdict was unanimous in its decision to award nothing for future damages or for past lost earnings, lost profits or other past economic losses.

19

Both parties' medical experts opined that Sokol suffered from preexisting degenerative knee conditions that were (or may have been) exacerbated by his fall. Sokol's medical expert also claimed a cartilage injury to Sokol's left knee attributable to the fall, but Dr. Vance testified that the cartilage loss was common with age and could not be attributed to the fall. Although Sokol and his friends testified that he no longer enjoyed physical activities that he used to enjoy, virtually all photographic evidence of such activities was decades old at the time of the trial from which the jury might infer a gradual tapering off in activity due to Sokol's preexisting conditions. Dr. Kelly testified that the objective evidence of Sokol's knee condition was insufficient to account for the extent of his ongoing pain and Dr. Vance testified that the objective evidence of the injury did not appear disabling. The limitations Dr. Kelly placed on Sokol's future activities were based solely on Sokol's subjective complaints of ongoing pain and swelling, but there was no objective evidence in Sokol's medical records to establish ongoing swelling in his knee following activities. Dr. Kelly could not recommend any required further treatment, and Dr. Vance testified that Sokol needed no ongoing treatment other than good nutrition, exercise and body conditioning. In addition, the jury saw a video of Sokol walking, standing and squatting, without any discernable limp or difficulty. With such conflicting evidence as to the severity of Sokol's physical injuries, the extent to which they were preexisting, and the impact of the injuries on Sokol's activities we cannot find that the jury lacked substantial evidence to support its damages determination on the basis of Sokol's physical injuries.

Sokol further contends the noneconomic damages award is inadequate in light of the severe and permanent psychological injuries Sokol suffered as a result of his fall. There was conflicting evidence at trial regarding the scope and severity of Sokol's psychological injuries. While Sokol's expert opined that Sokol suffered from PTSD as a result of the fall and was subject to a lengthy and ongoing recovery period, Rosciszewski's expert diagnosed Sokol as suffering from a different disorder, which typically resolved within six months. In addition, the diagnosis of each expert necessarily relied upon Sokol's self-described symptoms, provided following Sokol's review of the civilian checklist for PTSD. In analyzing the experts' testimony, the jury was instructed pursuant to CACI No. 219(b) to consider, among other things, the "facts the expert relied on." We can infer from the jury's determination not to award future noneconomic damages that it did not believe Sokol's testimony, and the opinion of Dr. Schanowitz, that Sokol suffered ongoing psychological injury. The trial court candidly admitted, in its order denying Sokol's motion for new trial and during hearing on the motion, that it did not believe Sokol's testimony as to his psychological harm and did not accept the opinion of either of the psychological experts.

The jury and trial court's credibility determination does not appear arbitrary in this instance, considering the involvement of Sokol's attorney in promoting Sokol's contact with Dr. Schanowitz, Dr. Schanowitz's provision of the PTSD checklist to Sokol prior to his diagnosis, the pronounced contrast between the magnitude of Sokol's objective physical injury and the level of PTSD symptoms he asserted and the conflicting diagnosis

of Dr. Carroll.  We therefore find sufficient evidence to support the jury's determination not to award Sokol future damages for psychological injury.

*Judicial Misconduct*

Finally, Sokol contends the jury awarded inadequate damages because the trial court unconsciously cued the jury to the "trial court's perceived bias" against Sokol, his witnesses and representatives.  As a threshold matter, Sokol neither raises misconduct of the court as a separate issue on appeal nor discusses legal authorities on the issue.  (See Cal. Rules of Court, rule 8.204(a)(1)(B) [appellant must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"].)  In any event, we find no prejudicial error.

Sokol first argues that the trial court, in ruling on his posttrial motions, disregarded the opinion of the mental health experts on both sides based on an "incorrect assumption."  In its tentative ruling, the trial court stated that Sokol "offered a PTSD case that the court thought was very close to frivolous."  The court's assessment appeared based in part on Sokol's background, as Sokol was arrested twice by the Polish secret police, and was essentially kicked out of his country, but then claimed to suffer "PTSD from an incident of falling down five or seven stairs."  The court characterized Sokol as being "told by his lawyer he has PTSD arising from the fall; he is referred by his lawyer to a clinical psychologist who would say so; and then brings that clinical psychologist (Schanowitz) to trial to say so.  The court didn't buy it, and evidently neither did the jury."  Sokol characterizes the trial court's assessment as making "an unfounded and

22

incorrect assumption about Sokol's mental state based on no evidence whatever," as there was "no testimony as to Sokol's detailed participation in Solidarity."

On appeal, "we review the trial court's ruling, not the reasons given for it. If the ruling is correct, it will be affirmed even if it was reached by a mistaken line of reasoning." (*Metric Man, Inc. v. Unemployment Ins. Appeals Bd.* (1997) 59 Cal.App.4th 1041, 1046.) Although Sokol testified that he participated in the solidarity movement, was arrested twice and spent time in jail, we need not consider the extent to which such evidence impacted the trial court's ruling. The trial court, sitting as the 13th juror, heard all of the same evidence as the jury and arrived at the same conclusion: the evidence of ongoing psychological injury was insufficient to warrant an award of future damages. As discussed above, there was substantial evidence to support such a determination, even without consideration of Sokol's history in Poland.

Sokol further contends the trial court influenced the jury against him and provides the following examples. First, Sokol refers to an instance in which the trial court told Dr. Schanowitz not to not walk in the well, allegedly "in a harsh tone of voice." However, the admonition was given when Dr. Schanowitz exited the witness stand *after the jury had left the courtroom* and therefore it could not have impacted the jury, regardless of the court's tone.

Second, Sokol contends the trial court erred in describing Rosciszewski to the jury as "an elderly and ill woman." Before opening arguments, plaintiff's counsel informed the trial court that it had incorrectly characterized Rosciszewski as "ill" when explaining her absence at trial. Sokol's counsel asked the court to correct the error, indicating that

23

the error was curable. The court made the following correction: "Yesterday I told you that the defendant was not present because she was gravely ill. I got that somewhere. I'm not sure where, but as it turns out, it was my mistake. She is not present. That part is correct. She's not going to be present for the trial. [¶] But the gravely ill part was not correct, and I wanted to let you know that I have erred in that regard." Sokol's counsel did not express any dissatisfaction with the curative instruction, did not seek a mistrial and did not raise the issue again until moving for a new trial postverdict.

Third, Sokol notes that following Sokol's initial testimony, his counsel stated to the court during a jury recess: "Your honor, during the direct testimony of Mr. Sokol, I observed your demeanor, and it appeared that some questions when they were answered or questions when they were asked, your expressions changed, and it seemed like your emotions were coming through your expressions—your feelings about the answers." The trial court disagreed with counsel's observation. Sokol's counsel did not raise any further similar issues during the trial.

Sokol contends "the cumulative effect of the trial court's actions in cueing the jury, acting disrespectfully to Sokol's witness and counsel, and repeating unwarranted assumptions about Sokol viz Solidarity, and misstating that Rosciszewski was elderly and ill, all become a steep hill for Sokol to climb." Sokol did not provide any legal authority to support reversal of the trial court's ruling based on such conduct.

In cases in which appellate courts have ordered new trials based on judicial misconduct, the trial court's conduct has typically exhibited obvious bias or involved expressing a definitive opinion on the merits of a claim contrary to facts, or in the face of

24

conflicting facts.[5]  Our review of the record fails to reveal any prejudicial misconduct here:  there is no evidence of explicit bias, unprofessionalism or any comments to the jury advocating the court's position on the merits of the case.  In contrast, the court commended and thanked both parties' attorneys at the conclusion of trial, for the manner in which they conducted the case.  On two separate occasions the court intervened to prevent Sokol from blurting out attorney-client confidences.  In addition, the court urged Sokol's counsel to move on to "plan B" during trial after observing counsel's consternation over technical difficulties with a video, expressed concern (after the jury had left) that such problems were "not good for your presentation," and later sympathized with Sokol's counsel's frustration with the ongoing technical glitches, noting that getting them smoothed out would provide "a lot smoother presentation."

The specific examples Sokol identifies do not require a different conclusion.  Two of the incidents cited by Sokol (the court's comments regarding solidarity at a postverdict hearing and admonishment of Sokol's expert) took place outside the presence of the jury and could not have affected the jury's deliberations.  The court's mistaken reference to

---

[5]    (See, e.g., *Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1001, 1002-1006 [court had ex parte contact with defense counsel, allowed him to repeatedly hum the Twilight Zone theme song when cross-examining plaintiff, used a penalty card scoring system to respond to objections (over plaintiff's counsel's objection) and made the comment " 'aren't they clever' " regarding plaintiff's testimony]; *Lewis v. Bill Robertson & Sons, Inc.* (1984) 162 Cal.App.3d 650, 655 [court expressed opinion in premises liability case that no premises defect caused the injury and characterized plaintiff's broken bone as having " 'healed perfectly' " despite uncontroverted testimony of permanent damage]; *Forte v. Schiebe* (1956) 145 Cal.App.2d 296, 300-301 [court characterized malice as undeniable, confessed to, admitted and beyond dispute when evidence of the party's malice was ample but not conclusive].)

Rosciszewski's grave illness was quickly corrected at the onset of the case (prior to any witness testimony) and there is no reason to believe it prejudiced Sokol. Sokol is left with his counsel's statements regarding the court's unconscious cueing of the jury with facial expressions during Sokol's testimony. Even in a criminal case, where the court's powers of comment are more limited than in a civil proceeding,[6] "[t]he mere statement of the defense counsel that in his opinion the trial judge expressed his disbelief as to the testimony by his facial expressions is not a sufficient showing of judicial misconduct." (*People v. Walker* (1957) 150 Cal.App.2d 594, 605.)

## DISPOSITION

The judgment is affirmed. Rosciszewski shall recover her costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

HALLER, J.

---

[6]     (See *Lewis v. Bill Robertson & Sons, Inc.* (1984) 162 Cal.App.3d 650, 654.)

26